## A01A1869. BLACKFORD v. THE STATE.

(554 SE2d 290)

JOHNSON, Presiding Judge.

Gerald Edward Blackford, Jr. was indicted for malice murder in the death of Barbara Mixon. A jury found him guilty of the lesser included offense of voluntary manslaughter. Blackford appeals, alleging (1) the evidence was insufficient to support his conviction, (2) the trial court erred by failing to instruct the jury on the defense of accident, (3) the trial court erred by admitting his videotaped statement into evidence, and (4) his trial counsel rendered ineffective assistance by failing to present evidence of Blackford's good character and by failing to call known exculpatory witnesses to testify on Blackford's behalf. Because each of these enumerations of error lacks merit, we affirm Blackford's conviction for voluntary manslaughter.

1. Viewed in a light most favorable to support the jury's verdict, the evidence shows that Blackford had been the victim's boyfriend, on and off, for approximately four years. Nikki Rapp, the victim's roommate, testified that when she left for work on the evening of June 27, 1998, Blackford was visiting the victim. When she returned at about 4:00 a.m., she discovered the victim lying facedown in her bathroom with her hands and ankles bound behind her with duct tape. The victim's bra was ripped, her mouth was taped, and there was blood on a partially ripped t-shirt wrapped around her. A knife and evidence of drug use were found in the bathroom.

The medical examiner testified that in his opinion the duct tape was put around the victim's face after she was already dead. He further testified that the victim died from manual strangulation. While he acknowledged that the victim's fractured ribs could have been caused by a fall if she struck something when she fell, he testified that the bruising around the area of the fractures was much more consistent with a strong kick or a punch. He also noticed bruising on the back of her upper right arm, under the bra strap on the back of her right shoulder, and on the back of her left shoulder. The victim also sustained a hematoma to the bony ridge around her eye that the medical examiner testified would have been caused by a blunt impact. The victim received all of these injuries before she died.

A police officer testified that he met with Blackford at his stepbrother's house and Blackford agreed to ride to the police station and speak with the investigators. The detective who interviewed Blackford at the police station testified that Blackford gave both a written statement and a videotaped statement. In the videotaped statement, Blackford initially denied any involvement in the victim's murder. He stated that he was with the victim that night and that they had been having sex, drinking, and using cocaine. He further stated that he left the victim alive. However, as he was signing a written statement

to that effect, Blackford began to confess to killing the victim.

Blackford informed the police that he went to use the bathroom before he left the victim's house. The victim grabbed a knife from the back of the toilet and lunged at him. Blackford then grabbed the victim by her throat, they spun around, and they fell to the floor. He repeated over and over, "I should have let go, I just didn't let go." He later admitted that he had the chance to get away, but he just did not let go. Blackford admitted that he bound the victim with duct tape to make it look like someone else killed her.

Michael Sweatman, who is currently in jail on aggravated assault and burglary charges, testified that he shared a jail cell with Blackford. Sweatman testified that Blackford told him he had been hanging out, partying, and having sex with a girl he was dating. He said that afterward they started arguing and the victim came at him with a knife while he was using the bathroom. To subdue her, Blackford grabbed her by the throat and choked her. When he realized the victim was dead, he decided to bind her with duct tape and make it look like a robbery.

OCGA § 16-5-2 (a) defines voluntary manslaughter as follows: "A person commits the offense of voluntary manslaughter when he causes the death of another human being under circumstances which would otherwise be murder and if he acts solely as the result of a sudden, violent, and irresistible passion resulting from serious provocation sufficient to excite such passion in a reasonable person." Blackford's statement that he grabbed the victim by the throat and did not let go, coupled with the medical examiner's testimony regarding the victim's other injuries, Blackford's actions after the strangulation, and his comments to a jail inmate that his girlfriend was "nagging and bitching and . . . getting on his nerves" authorized the jury to find Blackford guilty beyond a reasonable doubt of voluntary manslaughter.[1]

As for Blackford's claim that the jury should have found he acted in self-defense, the jury was properly charged that the use of excessive or unlawful force, while acting in self-defense, is not justifiable, and Blackford's conduct would not be justified if the jury found the force used exceeded that which he reasonably believed was necessary to defend against the victim's use of unlawful force.[2] Whether Blackford acted in the heat of passion or with justification depended largely on the credibility of the witnesses, which was for the jury to assess.[3] The jury was entitled to believe those parts of Blackford's

---

[1] *Jackson v. Virginia*, 443 U. S. 307 (99 SC 2781, 61 LE2d 560) (1979); *Smith v. State*, 231 Ga. App. 677, 678-679 (1) (499 SE2d 663) (1998).

[2] See *Clark v. State*, 271 Ga. 27, 29 (2) (518 SE2d 117) (1999).

[3] See *Smith*, supra; *Brown v. State*, 225 Ga. App. 218, 219 (483 SE2d 633) (1997).

statement which they chose to believe and to disregard those portions of the statement which they disbelieved.

2. Blackford next contends the trial court erred in failing to give the jury a requested instruction on the law of accident. To authorize a jury instruction on a subject, there need only be produced at trial slight evidence supporting the theory of the charge.[4] Whether the evidence is sufficient to authorize the giving of a charge is a question of law.[5]

Here, Blackford contends that the necessary evidence to support a charge on accident was proved by his testimony that he did not mean to kill the victim, but that her injuries were sustained as they struggled and fell during the victim's knife attack. He also relies on the medical examiner's testimony that the victim could have died "even if the grip was released fairly soon when something like this is done." While this evidence may have supported a finding that the killing was not intentional, it did not support a theory of accident as defined in OCGA § 16-2-2.

A person may not be found guilty of a crime committed by accident "where it satisfactorily appears there was no criminal scheme or undertaking, intention, or criminal negligence."[6] Accident is an affirmative defense, and the defendant must establish that he acted without criminal intent and was not engaged in a criminal scheme and that his actions did not show an utter disregard for the safety of others who might reasonably be expected to be injured thereby.[7]

In the present case, Blackford admitted that when he saw the victim lunge at him with a knife, he grabbed her by the throat and he did not let go, even after they fell to the floor. He later acknowledged that he had a chance to get away from the knife-wielding victim, but did not. His stated intention was "to try and get her to pass out." Based on this evidence, an instruction to the jury on the law of accident was not warranted. Although the victim may have been unintentionally injured, Blackford intentionally put his hands around the victim's throat and placed the victim in reasonable apprehension of immediate bodily injury. This action constituted, at the very least, criminal negligence.[8] Blackford's testimony that he had not intended to kill the victim did not warrant a charge on accident.[9]

3. The trial court did not err by admitting Blackford's videotaped statement into evidence. We first note that prior to trial, the trial

---

[4] See *Koritta v. State*, 263 Ga. 703, 704 (438 SE2d 68) (1994).
[5] *Turner v. State*, 262 Ga. 359, 361 (2) (c) (418 SE2d 52) (1992).
[6] OCGA § 16-2-2.
[7] *Davis v. State*, 269 Ga. 276, 279 (3) (496 SE2d 699) (1998).
[8] See id.
[9] *Brooks v. State*, 262 Ga. 187, 188 (3) (415 SE2d 903) (1992).

court suppressed the portion of Blackford's statement made after he began confessing to the crime but before he received his *Miranda* warnings. This decision is not enumerated as error, and Blackford's trial counsel testified that, for strategic reasons, he decided to allow the jury to view the entire videotaped statement, including the suppressed portion, so the jury could see Blackford's anguish and remorse.

Blackford contends on appeal that both his inculpatory statement to the police *before* he received *Miranda* warnings and his recorded statement to the police *after* he received *Miranda* warnings are inadmissible. However, since Blackford's counsel decided to allow the jury to view Blackford's inculpatory statement *before* he received a *Miranda* warning, even though the trial court had previously suppressed this portion of the statement, Blackford has waived any argument that this portion of his recorded statement was inadmissible. Any error in the admission of this portion of the recorded statement was self-induced and provides no basis for reversal.[10] On appeal, a party may not complain of a ruling that he contributed to or acquiesced in by his own action, trial strategy, or conduct.[11]

As for Blackford's recorded statement after *Miranda* warnings were given, the standard of review is threefold. First, if there is any evidence to support the trial court's findings of a valid *Miranda* waiver, such findings will not be disturbed.[12] Second, a trial court's decisions regarding questions of fact and credibility must be accepted unless clearly erroneous.[13] And, finally, the evidence is construed to uphold the trial court's findings.[14]

Viewed in this light, the record shows that Blackford voluntarily waived his rights and agreed to continue to talk to officers after he was given *Miranda* warnings. There is no official transcript, but we have carefully reviewed the videotape of Blackford's interview in its entirety. The videotape shows that as Blackford was about to sign his written statement he, spontaneously and without further questioning, began to confess to killing the victim. When Blackford began to tell the officers that he taped the victim's hands, mouth, and feet to mislead investigators, an officer read Blackford his *Miranda* rights. Blackford stated he did not need a lawyer and he would continue to talk to the officers. At no time did he say that he did not want to talk to the officers. While Blackford was obviously distressed, the video-

---

[10] *Singleton v. State*, 240 Ga. App. 240-241 (4) (522 SE2d 734) (1999); *Johnson v. State*, 198 Ga. App. 316, 317 (5) (401 SE2d 331) (1991).

[11] *Cunningham v. State*, 244 Ga. App. 231, 234 (2) (535 SE2d 262) (2000).

[12] *Tate v. State*, 264 Ga. 53, 54 (1) (440 SE2d 646) (1994).

[13] Id.

[14] Id.

tape shows and the detectives testified that he was well aware of everything going on and that there was no question regarding his ability to understand his rights. The record further shows that Blackford was 37 years old, could read and write, and spoke English and German. Because the trial court's conclusion that Blackford's post-*Miranda* statement was freely and voluntarily given is supported by the evidence, we find no error in its admission.[15]

Blackford argues that his post-*Miranda* confession constituted "fruit of the poisonous tree" since it was given immediately after his initial confession and since it was obtained after prolonged questioning. However, the record shows that no actual coercion attended his initial confession. In fact, the videotape shows nothing but a polite and civil dialogue between Blackford and the officers. Although the interview might have lasted six hours, there is no evidence from the videotape that Blackford was "grilled."

A review of the totality of the circumstances surrounding Blackford's initial statement to the officers shows that Blackford voluntarily accompanied officers to the police station and was allowed to take breaks during the interview and to smoke outside. He had been told he was not under arrest and was free to go. As Blackford was about to sign his written statement he, spontaneously and without any questioning or comment by the officers, began to confess to the crime. Neither the videotape nor the record in this case shows any coercion on the part of the officers.

Moreover, even assuming Blackford's initial confession had been tainted, the admissibility of any subsequent statement turns on whether the statement was knowingly and voluntarily made.[16] As we have previously stated, we find that Blackford's subsequent recorded statement was knowingly and voluntarily given. Accordingly, this enumeration of error lacks merit.

4. Blackford's fourth and fifth enumerations of error concern trial strategy or tactics. Specifically, Blackford contends his trial counsel rendered ineffective assistance of counsel by failing to call known witnesses to present evidence of his good character and to testify on his behalf. To prevail on a claim of ineffective assistance of counsel, Blackford bears the burden of proving (1) that his trial counsel's performance was deficient, and (2) that but for this deficiency the outcome of the trial would have been different.[17] In addition, a strong presumption exists that trial counsel performed within the wide range of reasonable professional assistance and that challenged

---

[15] See *Reinhardt v. State*, 263 Ga. 113, 115 (3) (b) (428 SE2d 333) (1993).

[16] *Vaughan v. State*, 210 Ga. App. 381, 384 (3) (b) (436 SE2d 19) (1993).

[17] *Turner v. State*, 245 Ga. App. 294, 295 (4) (536 SE2d 814) (2000).

actions might be considered sound trial strategy.[18] The trial court's determination that Blackford was afforded effective assistance of counsel will not be reversed on appeal unless it was clearly erroneous.[19]

At the hearing on the motion for new trial, Blackford's trial counsel testified that he was aware of the witnesses referred to in Blackford's brief and that either he or his investigator had spoken to most of them. However, trial counsel made a strategic decision not to call these witnesses because (1) he did not think evidence of good character would be helpful in a self-defense case, (2) he wanted to minimize the violence in Blackford's relationship with the victim, and (3) he did not want to give the state an opportunity to introduce evidence of Blackford's bad character. Trial counsel further testified that he wanted to keep closing argument, and he felt that closing argument was more important than introducing evidence by the known witnesses.

This Court has consistently held that strategic decisions at trial are the exclusive province of the lawyer, and decisions concerning whether to call character witnesses and whether to place the defendant's character in issue are matters of trial strategy and do not equate with ineffective assistance of counsel.[20] Trial counsel's strategic decisions made after thorough investigation are virtually unchallengeable.[21] After hearing trial counsel's testimony, the trial court denied Blackford's motion for new trial, finding that he was afforded effective assistance of counsel. The record supports this finding.

*Judgment affirmed. Ruffin and Ellington, JJ., concur.*

DECIDED AUGUST 22, 2001 — 

*Stepp & Randazzo, Glynn R. Stepp*, for appellant.
*Daniel J. Porter, District Attorney, Phil Wiley, Dawn H. Taylor, Assistant District Attorneys*, for appellee.

---

[18] *Davis v. State*, 238 Ga. App. 84, 89 (7) (517 SE2d 808) (1999).
[19] *Turner*, supra.
[20] See *Mitchell v. State*, 223 Ga. App. 319, 320 (5) (477 SE2d 612) (1996).
[21] *Teat v. State*, 237 Ga. App. 867, 869 (2) (516 SE2d 794) (1999).